J-S84002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: B.J.Z. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: D.V., MOTHER | No. 2499 EDA 2018 |

Appeal from the Decree Entered July 24, 2018
In the Court of Common Pleas of Bucks County
Orphans' Court at No(s): CV-2017-09114

| IN RE: N.M.Z. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: D.V., MOTHER | No. 2505 EDA 2018 |

Appeal from the Decree Entered July 24, 2018
In the Court of Common Pleas of Bucks County
Orphans' Court at No(s): CV-2017-09116

| IN RE: C.J.Z. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: D.V., MOTHER | No. 2506 EDA 2018 |

Appeal from the Decree Entered July 24, 2018
In the Court of Common Pleas of Bucks County
Orphans' Court at No(s): CV-2017-09115

BEFORE: BENDER, P.J.E., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED APRIL 1, 2019**

D.V. ("Mother") appeals from the decrees entered on July 24, 2018, that granted the petitions filed by the Bucks County Children and Youth Social Services Agency ("Agency") to involuntarily terminate her parental rights to her minor children, B.J.Z. (born in November of 2013), C.J.Z. (born in August of 2011), and N.M.Z. (born in November of 2009), (collectively "Children"),

pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23

Pa.C.S. §§ 2101-2938.[1, 2, 3] We affirm.

In her brief, Mother sets forth the following question for our review:

Should the [orphans'] [c]ourt be reversed when [the Agency] has
not met the requirements of 23 Pa.C.S.[] § 2511(a)(2), (5), and
(8) because [the Agency] has not produced clear and convincing
evidence that … [C]hildren were not bonded, that the termination
of … [M]other's parental rights would best serve the needs and
welfare of … [C]hildren, or that she is unable to remedy the issues
that caused … [C]hildren to be taken into care?

Mother's Brief at 4.

We review an order terminating parental rights in accordance with the

following standard:

When reviewing an appeal from a decree terminating
parental rights, we are limited to determining whether the
decision of the trial court is supported by competent evidence.
Absent an abuse of discretion, an error of law, or insufficient
evidentiary support for the trial court's decision, the decree must
stand. Where a trial court has granted a petition to involuntarily
terminate parental rights, this Court must accord the hearing

_____

[1] The orphans' court issued the decrees on July 18, 2018 at case numbers
2499, 2505, and 2506 EDA 2018; however, the decrees were not entered on
the docket until July 24, 2018. The appeals at 2499, 2505, and 2506 EDA
2018 were subsequently consolidated *sua sponte* by *per curiam* order of this
Court, as all of these matters involve related parties and issues. Order,
9/24/18.

[2] The parental rights of Children's father, J.Z. ("Father"), were terminated by
separate decrees entered on the same date. Father has filed separate
appeals. **See** Docket Nos. 2471, 2492, and 2496 EDA 2018.

[3] A guardian ad litem ("GAL"), Emily Ward, Esquire, and a child advocate,
Linda Shick, Esquire, were appointed to represent the best interests and the
legal interests of Children. Both attorneys participated in the termination
hearing and filed briefs in this appeal.

judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276. Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* at 276 (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Gary B. Gilman of the Court of Common Pleas of Bucks County, Orphans' Court Division, filed on September 26, 2018. We conclude that Judge Gilman's thorough, well-reasoned opinion properly disposes of the issues raised by

Mother.  Accordingly, we adopt Judge Gilman's opinion as our own and affirm

the decrees appealed from on that basis.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/1/19

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:      B.J.Z                                    : No. 2017-A9114
            C.J.Z.                                   : No. 2017-A9115
            N.M.Z.                                   : No. 2017-A9116
                                                     :
            INVOLUNTARY TERMINATION                  :
            OF PARENTAL RIGHTS OF D.V.               :

## OPINION

### I.      INTRODUCTION

D.V. (hereinafter "Appellant" or "Mother") is the biological mother of B.J.Z., C.J.Z., and

N.M.Z., (hereinafter the "Children") presently four (4), seven (7), and eight (8) years of age,

respectively. Mother has appealed to the Superior Court from our July 18, 2018 Decrees

granting the Petitions filed by the Bucks County Children and Youth Social Services Agency

(hereinafter referred to as the "Agency") to Involuntarily Terminate her Parental Rights as to

these three Children. An evidentiary hearing, wherein the factual predicate underlying our

decision was established, was conducted on January 30, 2018. Thereafter, following

transcription of the record, all parties submitted proposed findings of fact and conclusions of law.

### II.     BACKGROUND

The relevant facts and procedural history of this case are as follows: B.J.Z. was born on

November 28, 2013, C.J.Z. was born on August 26, 2011, and N.M.Z. was born on November

24, 2009. The Agency first received a referral regarding this family in 2009 when the oldest

child, N.M.Z. was born and tested positive for methadone. The Agency was concerned at that

1

time with Mother's level of drug treatment compliance. In-home services were provided and that Agency referral was closed in 2011, several months prior to C.J.Z.'s birth. (N.T. 1/30/2018, pp. 120-121).

The family's case was reopened on January 29, 2013, due to ongoing concerns as to the Children being inadequately supervised, the condition of the home, substance abuse by the parents, the Children not be appropriately dressed, and C.J.Z. being developmentally delayed. (N.T. 1/30/2018, pp. 14, 122). General protective services were in place at the time of B.J.Z.'s birth in 2013. A family service plan was created and the Agency provided services to assist the family during the next three (3) years. (N.T. 1/30/2018, pp. 14-15). However, as a result of the parents' noncompliance with the requirements of the support housing program, they were evicted from their home. Following the eviction the family moved to a hotel. A voluntary placement with the Agency agreement for the Children was signed by the parents in August 2016, when the parents could no longer pay for the hotel and became homeless. (N.T. 1/30/2018, pp. 15-16).

The Children were adjudicated dependent on September 2, 2016 by Order signed by Judge Mellon of this bench, and all three Children have remained in the custody of the Agency since that time. (N.T. 1/30/2018, p. 16). Both parents have failed to adequately comply with the Permanency Placement Plans that were implemented. On November 6, 2017, the Agency filed the subject Petitions for the Involuntary Termination of Mother's Parental Rights under § 2511 (a) (2), (5), and (8). On August 17, 2018, Mother filed a timely appeal of our July 18, 2018 Decrees in the Superior Court.

2

## III. APPELLANT'S STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

Appellant's Notice of Appeal was accompanied by a Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925 (a) (2), which we repeat, *verbatim,* as follows:

> 1. Appellant submits that Appellee has failed to meet the requirements of 23 Pa.C.S.A. 2511 (a) (2), (5) and (8) in that Appellee has not produced clear and convincing evidence that the minor children were not bonded, that the termination of mother's parental rights would best serve the needs and welfare of the children, nor that she is unable to remedy the issues that caused the children to be taken into care.

## IV. DISCUSSION

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis, as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re Adoption of C.D.R., 111 A.3d 1212, 1215 (Pa.Super. 2015) citing In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

Here, the Agency pursued termination pursuant to §2511 (a)(2), (5), and (8), which provide, in pertinent part, as follows:

(a)     General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

3

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

As the party seeking termination, the Agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating Mother's parental rights. Clear and convincing evidence means testimony that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re M.M., 106 A.3d 114, 117 (Pa.Super. 2014) (internal citations omitted).

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." In re C.P. 901 A.2d 516, 520 (Pa.Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the child, every possible effort must be made to reunite the family. In addition, all circumstances must be considered when analyzing

4

a parent's performance or non-performance of parental obligations. A parent's performance must be measured in light of "what would be expected of an individual in circumstances which the parent under examination finds himself." In re Matsock, 611 A2.d 737, 742-743 (Pa.Super. 1992) (internal citations omitted).

In reaching a decision following a termination proceeding, the trial court's initial focus is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. In re B.L.L., 787 A.2d 1007 (Pa.Super. 2001). Only if the statutory grounds for termination are established, pursuant to §2511(a), does the welfare of the child become the court's paramount consideration, and the court must reflect on whether termination will best serve the child, focusing on the developmental, physical, and emotional needs and welfare of the child pursuant to §2511(b). In re L.M., 923 A.2d at 511.

Following the hearing in the present case, and upon careful consideration of all of the testimony and evidence presented, we determined that the Agency met its burden of demonstrating clear and convincing evidence in support of the termination of Mother's parental rights.

The following facts pertinent to applicable decisional law were developed at the evidentiary hearing.

### A. THE AGENCY PRESENTED CLEAR AND CONVINCING EVIDENCE IN SUPPORT OF TERMINATING THE PARENTAL RIGHTS OF MOTHER PURSUANT TO SECTIONS 2511(a)(2), (5), and (8) OF THE ADOPTION ACT

It is clear that in a termination proceeding, the initial focus is on the conduct of the parents. In re A.D., 93 A.3d 888, 896 (Pa. Super. 2014). The statute does not require aggregate conditions of capacity, abuse and neglect in order for a court to terminate parental rights. Rather, the statute clearly states one condition is sufficient. If the court finds that there is clear and

5

convincing evidence to establish that the probability of a parent performing his or her parental duties is very low, the court may terminate parental rights. In re Z.P., 994 A.2d 1108, 1126 (Pa.Super. 2010).

## 1. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(2)

Pursuant to Section 2511(a)(2) of the Adoption Act, termination of parental rights is permissible if the following three elements are met:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

> The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted).

In re Adoption of C.D.R., 111 A.3d at 1216.

As our Supreme Court explained in In re Adoption of Michael J.C., 486 A.2d 371, addressing §2511(a)(2):

> When a parent has demonstrated a continued inability to ...provide a safe environment for a child...and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified. In re Z.P., 994 A.2d 1108, 1118 (Pa.Super. 2010).

In the instant case, the Agency has alleged that Mother is incapable of parenting the Children. In order to terminate the parental rights of Mother, the court must not only find incapacity, but it must also find that the conditions which caused Mother's incapacity are irremediable. We have found that to be so in this case.

6

We heard the testimony of Victoria Kane, a social worker with the Agency. Ms. Kane has been involved with this case since the fall of 2016 and she testified regarding her review of the Agency file and familiarity with this family for the time periods predating and since her initial involvement. (N.T. 1/30/2018, pp. 13-14). Ms. Kane testified that the most recent referral for the family to receive in-home general protective services from the Agency dates back to January 2013, before the youngest child was born. (N.T. 1/30/2018, p. 14). She testified further that the referral resulted from circumstances which included, poor supervision of the Children, substance abuse issues for both parents, the condition of the family home, the Children not being properly dressed, and also at that time, C.J.Z. was determined to be developmentally delayed. (N.T. 1/30/2018, p. 14).

Ms. Kane testified about the family service plan which was created and which required, in part, that the parents "deal with their substance abuse, have their rent be paid on time, [and] get the children into the necessary services that they needed..." (N.T. 1/30/2018, pp. 14-15). The Placement Permanency Plan for Mother included a requirement that she continue with recommended levels of treatment. The Agency imposed that Mother receive a drug and alcohol evaluation, in addition to Mother's claim that she was receiving Suboxone through a private medical practice, Tri-State Home Physicians. (N.T. 1/30/2018, pp. 16-17). Another objective was to obtain a source of income enabling her to provide appropriate and safe housing for the Children. In addition to those significant objectives, Mother was to attend parenting classes, maintain visitation with the Children and maintain contact with the Agency.[1]

---

[1] The Agency caseworker prior to Ms. Kane had documented concerns while the Agency was providing in-home services, prior to the Children coming into the care, about the parents' inability to appropriately supervise the Children.

7

Ms. Kane also testified that when Mother signed the voluntary placement agreement in August 2016, Mother had relapsed on heroin and was facing criminal charges. (N.T. 1/30/2018, p. 18).

In November 2016, Ms. Kane initiated a referral for Mother with the LINKS reunification program. (N.T. 1/30/2018, p. 19). Mother was to meet with LINKS weekly for assistance with the Bucks County Housing Link, and to arrange a drug and alcohol evaluation. LINKS was also providing transportation for Mother to enable her to maintain her visitation with the Children. (N.T. 1/30/2018, pp. 19-20).

In December 2016, Mother was discharged from the private program that was providing her Suboxone. Ms. Kane was informed by a counselor from that program that Mother had tested positive for cocaine, codeine and morphine. As a result, Mother was placed on a probationary period. Following an additional positive test for opiates, Mother was discharged from that program. Ms. Kane testified that Mother did not inform her of that discharge until February 2017, and therefore Ms. Kane had erroneously continued to believe that Mother was receiving therapeutic Suboxone. (N.T. 1/30/2018, p. 20).

In April 2017, Mother received a drug and alcohol evaluation through Aldie. The counselor at Aldie recommended inpatient treatment, after determining that Mother was exhibiting the same behaviors that she had exhibited when she was involved with Aldie for treatment before the Children had come into care. (N.T. 1/30/2018, pp. 21-22). Mother did not accept that recommendation and stated that she would set-up her own treatment through SOAR. (N.T. 1/30/2018, p. 22). Ms. Kane testified that Mother had visited SOAR while she was living in a shelter. The shelter provided her transportation and she received two (2) assessments. Since

8

her drug test results were positive, SOAR would not accept Mother for services until she had a negative test. Mother never began services through SOAR. (N.T. 1/30/2018, p. 22).

When Ms. Kane became involved with this family, Mother had an outstanding bench warrant from September 21, 2016, for a failure to appear at a violation of probation hearing. That warrant remained outstanding until July 2017.[2] Mother began her incarceration at the Bucks County Correctional Facility, where she remained until August 24, 2017, and she was then transferred to the Bucks County Community Women's Center, where she remained until December 4, 2017. (N.T. 1/30/2018, pp. 28-29). After Mother was incarcerated, the Center for Excellence, another Family Services Association program, began working with Mother again despite her prior discharges due to noncompliance. (N.T. 1/30/2018, p. 28). On December 4, 2017, Mother was released from prison to the inpatient facility at Libertae. Ms. Kane testified on January 30, 2018 that Mother had thus far been compliant with the Libertae program. (N.T. 1/30/2018, pp. 29-31).

Ms. Kane also testified about Mother's mental health treatment. Mother received outpatient therapy through Bucks County Mental Health; however, the counselor from that program informed Ms. Kane that Mother's attendance was inconsistent. Mother began those services in March 2016, stopped attending for three months, and began again in November 2016. Although Mother was not officially discharged from that program, the counselor noted that Mother stopped scheduling appointments. (N.T. 1/30/2018, p. 24).

---

[2] Mother testified that she was incarcerated due to a "violation of probation, absconding, and I caught a new charge." (N.T. 1/30/2018, p. 135). She testified that the violation resulted from a fight with another individual for which she was charged with recklessly endangering another person. The new charge was as a result of possession of Clonazepam. (N.T. 1/30/2018, p. 147). Mother testified that she obtained money for drugs from friends or from selling her Suboxones. (N.t. 1/30/2018, p. 148).

As for parenting classes, Ms. Kane stated that she initiated a referral for Mother through Family Services Association. A program coordinator was assigned to Mother in January 2017, however Mother was discharged from the program in February 2017, due to lack of compliance. (N.T. 1/30/2018, pp. 24-25).

Ms. Kane testified that the records regarding this family, prior to her own involvement, include no documentation of Mother ever maintaining employment. Since her involvement, Ms. Kane and Mother have had ongoing conversations about the importance of employment and of a source of income to support herself and the Children. However, Mother never appreciated the importance of her own employment, as she was adamant that Father would be the source of income for the family. (N.T. 1/30/2018, pp. 25-26).

Ms. Kane testified about Mother's housing circumstances since the Children came into the Agency's care, as follows:

> Mother was homeless up until April of 2017, at which point she was admitted to the Bucks County Emergency Shelter. Prior to that, the [a]gency had contact with the Bucks County Housing Link. Referral was officially put in in April, processed through the Bucks County Housing Shelter, and they were eligible for rapid rehousing if they were—if [Mother] was homeless. And I was informed that they were not eligible— she was not eligible for the supportive housing program, and that she was taken off the list due to noncompliance with the [a]gency, as well as the previous noncompliance with that specific program.
>
> Prior to that [Mother] was also on the Section 8 housing wait list for Bucks County since January 2015.

(N.T. 1/30/2018, p. 27).

Finally, parents' visitation history with the Children was detailed by Ms. Kane as follows:

> When the Children first came into care, visitation was scheduled twice a week for two hours. So a visitation schedule was created for them.

10

Unfortunately, there was a lot of inconsistencies with parents showing up to these visits. There was an ongoing pattern of parents cancelling one of the visits that they had during the week, and then keeping one. So more times often than not, the two visits per week were not happening.

\*     \*     \*

...I didn't want to decrease the visitation that was originally offered to the parents, so I had discussion with them about doing one longer visit once a week. We were all in agreement that that was something that parents more realistically could stick with and be consistent with.

\*     \*     \*

We started doing visits once per week as of December 2016.

\*     \*     \*

...[In the beginning parents were not required to confirm], but due to the inconsistencies that were happening ongoingly, the [a]gency started to require parents to confirm, at least one day prior, before the visit, before the end of the business day at 4:30.

(N.T. 1/30/2018, pp. 62-64).

Following the above description of the Agency's efforts to accommodate the parents with a visitation schedule that was suitable to them, and ideally more consistent for the Children's benefit, Ms. Kane provided detailed testimony of the parents' visitation history with their children beginning with September 26, 2016, the first visit after the dependency hearing, through the time period just prior to the hearing with this Court in January 2018. The lengthy history is replete with examples of visits when only one parent attended, or one or both parents missed scheduled visits, and visits were either cancelled by the parents or due to the parents' failure to confirm their attendance. On occasion, the parents cancelled visits that they had previously confirmed, or confirmed but then did not appear. There were also visits when one or both parents left early, or arrived late. One specific example was the visit on January 19, 2017,

11

Mother arrived one hour late, left the visit for one hour and twenty minutes, and returned to the visit with less than an hour remaining. Additionally, there were examples of instances when Ms. Kane was unable to contact the parents to clarify or confirm arrangements. (N.T. 1/30/2018, pp. 62-71). Specifically regarding Mother, Ms. Kane testified that since Mother's incarceration in July 2017, through the time of the hearing on January 30, 2018, while Mother was inpatient at Libertae, biweekly visitation had been implemented. (N.T. 1/30/2018, pp. 71-72).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated." In re B.L.W., 843 A.2d 380, 387, (Pa.Super. 2004). Based on the evidence and testimony provided, and in conformity with the pertinent statutory and decisional law, we found that Mother has failed to remedy her parental incapacities for a substantial time period. These incapacity factors include her housing, employment, substance abuse, and mental health issues which originally brought the Children into the Agency's care. It appears, clearly and convincingly, that the causes of Mother's ongoing parental incapacities will not be remedied. Accordingly, the grounds for termination under §2511(a)(2) have been met.

## 2. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(5)

The Agency was able to prove clearly and convincingly, pursuant to §2511 (a)(5), that the Children have been in care for six (6) months or more, that the reasons for such placement continue to exist, and that those reasons are not likely to be remedied within a reasonable time.

> ...under subsection (5), a trial court may find grounds for termination of parental rights where a child "has been removed from the care of the parent by the court ...

12

for a period of at least six months" and "the parent cannot ... remedy those conditions within a reasonable period of time." 23 Pa.C.S. § 2511(a)(5).

In re R.I.S., 36 A.3d. at 567, 577–78, (Pa. 2011).

Decisional law instructs this Court to evaluate the individual circumstances of a case, and consider all explanations offered by the parent facing termination of his or her parental rights when determining if the evidence, in light of the totality of circumstances, clearly warrants involuntary termination. In re R.I.S., 36 A.3d at 572. Based on the evidence and testimony provided regarding Mother's circumstances, and in accordance with the pertinent statutory and decisional law, we found that the Children have lacked proper parental care and control necessary for their well-being on a continuing basis, per §2511 (a)(5).

Mother testified that it is her desire to be reunited with the Children and it is her desire to find employment and establish housing through a Section 8 housing voucher. (N.T. 1/30/2018, pp. 138-139). She testified that she has done everything the Agency has asked of her "except for I can't look for work and my housing thing is kind of up in the air." ( N.T. 1/30/2018, p. 151). Mother has not provided documentation to the Agency regarding how long she can stay at Libertae or what continuing or future programs are available to her. (N.T. 1/30/2018, pp. 141-142). Mother testified that since her July 2017 incarceration and subsequent placement at Libertae, she has been clean and sober for the first time in ten years. (N.T. 1/30/2018, pp. 138-139). This is commendable. She testified further that without being incarcerated she probably would have continued using drugs. ( N.T. 1/30/2018, pp. 145-146).

Mother stated that the Children could live with her in the Family House at Libertae. That would be an option until March 2018. (N.T. 1/30/2018, p. 149). Mother had not yet investigated opportunities to provide the Children with present and future services they require, testifying that

13

she would do so if the Children came to live with her. (N.T. 1/30/2018, p. 150). Mother lacked realistic appreciation for the emotional impact on the Children if they were to leave their foster family and live with her in the Family House at Libertae, and then be transitioned again to whatever future living arrangements Mother might establish. She failed to appreciate the significance of repeatedly moving school-age Children to different areas and/or schools. Finally, Mother testified that she was aware she could attend doctor and dentist appointments for the Children, but she was not aware that a parent could attend a school function. Despite those representations, Mother has not only never attended any school function, including IEP meetings for her Children, but she has also never attended any of her Children's medical appointments. (N.T. 1/30/2018, pp. 154-156).

While Mother has experienced some recent sobriety while incarcerated and later while residing at Libertae, we determined that Mother has not remedied her parental incapacities so as to appropriately be able to provide and care for the Children. Unfortunately, the evidence is clear and convincing that she cannot and will not remedy those conditions within a reasonable time period.

### 3. Termination of Mother's Parental Rights is Warranted Pursuant to §2511(a)(8)

Finally, pursuant to §2511(a)(8), the Agency met its burden of proving that the Children have been in care for at least twelve (12) months, placement with the Agency having commenced in September 2016. The additional criteria set forth in (a)(8) have been fully detailed in other sections of this Opinion, *infra*.

14

As the Agency clearly and convincingly established the criteria set forth in 23 Pa.C.S. §2511(a) (2),(5), and (8) for termination[3], we next examined, pursuant to §2511(b), whether the termination of Mother's parental rights served the best interests of the Children, considering their developmental, physical, and emotional needs and welfare. We found that it did so.

## B. TERMINATION OF MOTHER'S PARENTAL RIGHTS IS WARRANTED PURSUANT to §2511(b) of the ADOPTION ACT

The Children have resided with their present foster parents since November 17, 2017, having begun respite care at their home on the weekends for the month prior to their transition to this foster family. The foster parents were comfortable with fostering all three Children and understood the Children's respective behavioral issues. The foster parents have biological twin boys the same age as the oldest child, N.M.Z. (N.T. 1/30/2018, pp. 82-83).

Ms. Kane testified that the foster home has been a good fit for the Children. The "whole family is very supportive of them." She testified further:

> [T]he Children are very hyperactive and need constant redirection in their behaviors. [The foster parents] have very calm demeanors. They don't get worked up...[a] lot of the behaviors are attention seeking...so they're not feeding into the behaviors to make them worse. And they seem committed to help these kids really stabilize their behaviors.

> They...are eager to welcome the children into their family...and want to have them long term.

(N.T. 1/30/2018, p. 84).

We heard testimony from Ms. Kane about the foster parents being affectionate toward the Children, and the Children reciprocating that affection. (N.T. 1/30/2018, p. 84). The foster parents' biological children receive speech services, just as N.M.Z and C.J.Z. do. The twins and

---

[3] We reiterate that the Superior Court need only agree with the trial court's decision as to any one subsection of §2511, in order to affirm termination of parental rights. In re M.M., 106 A.3d 114.

N.M.Z. are in the same classroom at school, and have exhibited an appropriate bond with each other. The twins have been a positive influence on N.M.Z.. Finally, Ms. Kane testified that the youngest Child, B.J.Z., was essentially non-verbal when he came into care. The foster parents have been very supportive and helpful in that regard. B.J.Z. has become very vocal and now speaks in full sentences. (N.T. 1/30/2018, pp. 85-86). We heard uncontroverted evidence of a strong bond between the foster family and these three Children. The foster parents have expressed an interest in adopting B.J.Z., C.J.Z. and N.M.Z.

When considering what situation would best serve a child's needs and welfare, the trial court must examine the status of the natural parental bond and whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial to the child.

> When conducting a bonding analysis, the court is not required to use expert testimony. ..Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding evaluation... "Above all else ... adequate consideration must be given to the needs and welfare of the child."... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ..
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

In re Z.P., 994 A.2d 1108, 1121 (internal citations omitted).

We found termination was warranted here, a result advanced not only by the Agency, but by the court-appointed best interests counsel for the Children and by separate court-appointed legal interests counsel for the Children. The record contains clear and convincing evidence that

16

Mother has not made reasonable or responsible strides toward adequately being able to parent the Children. The evidence presented suggests that Mother, while hopefully continuing her recent sobriety, has not set forth reasonably reliable future plans to provide adequate housing and support for herself or the Children.

Importantly for the Court's best interests analysis, the record is devoid of evidence of a necessary and beneficial relationship between Mother and the Children the existence of which, should Mother's rights be terminated, would result in a negative effect on the Children. In sum, the record contains clear and convincing evidence that Mother has been, and continues to be, incapable of adequately parenting B.J.Z., C.J.Z., and N.M.Z.

"[T]he court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." Id. *See M.E.P.*, 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.") (citations omitted). Here, Mother has repeatedly failed to remedy her parental incapacities and when these considerations are balanced against the Children's needs for permanence and stability, this Court concluded that it was in the best interests of B.J.Z., C.J.Z. and N.M.Z. to grant the Agency's Petition to Terminate Mother's Parental Rights.[4]

## V.   CONCLUSION

While we do not doubt that Mother loves the Children, for all of the reasons noted above, we respectfully submit that our Decrees of July 18, 2018, granting the Agency's Petitions to

---

[4]Our appellate courts have long held that parental bonds may properly be terminated"…when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimal parental care to which that child is entitled." In re: J.W., 578 A.2d 952, 958 (Pa.Super. 1990).

17

Involuntarily Terminate Mother's Parental Rights as to B.J.Z., C.J.Z., and N.M.Z., should be affirmed.

BY THE COURT:

_____
GARY B. GILMAN

_9/20/18_
Date

18